428 So.2d 629 (1983)
Ex parte: McCLARTY CONSTRUCTION AND EQUIPMENT COMPANY, INC. and Hal Cook Enterprises, Inc.
(In re: McCLARTY CONSTRUCTION AND EQUIPMENT COMPANY, INC., a corporation, and Hal Cook Enterprises, Inc., a corporation v. MINING, ORE AND EQUIPMENT COMPANY, INC., a corporation).
81-1060.
Supreme Court of Alabama.
March 4, 1983.
*630 James L. Shores, Jr. of Shores & Booker, Birmingham, for petitioners.
N. Lee Cooper and James L. Goyer, III of Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, for respondent.
ALMON, Justice.
This is a mandamus proceeding to compel discovery. For a complete understanding of the issues it will be necessary to set out the somewhat lengthy complaint:
"1. The plaintiffs are two Alabama corporations, McClarty Construction and Equipment Company, Inc. (herein `McClarty'), and Hal Cook Enterprises, Inc., (herein `Enterprises'). John Jenkins is a principal of McClarty and Hal Cook is a principal of Enterprises.
"2. The defendant is Mining, Ore and Equipment Company, Inc. (herein `MOE'). MOE is engaged in the business of buying and selling coal. MOE also engages in the business of buying, leasing and selling machinery and equipment used in the coal mining industry.
"3. Hal Cook and his wife own some three hundred (300) acres of land near Warrior, Alabama, on which there is located coal that has been strip mined and sold by Enterprises. In mining this coal Enterprises used some machinery and equipment it leased from MOE.
"4. In July, 1981, Enterprises returned to MOE all of the equipment it had leased from MOE with the exception of a Caterpillar D-9H Tractor Dozer with Ripper, Serial No. 90V2267 (herein `the D-9'), which Enterprises agreed to purchase from MOE.
*631 "5. On February 10, 1981, when MOE leased the D-9 to Enterprises it agreed to sell to Enterprises at its option, the D-9 for One Hundred Thirty-Five Thousand Dollars ($135,000), with all rentals previously paid by Enterprises to apply to the purchase price.
"6. In keeping this agreement, Enterprises owed MOE as of August 31, 1981, a balance of One Hundred Eighteen Thousand, Five Hundred Six and 63/100 Dollars ($118,506.63), on the purchase price.
"7. The coal mined by Enterprises and sold to MOE was given four classifications by MOE. HCE 551 was the classification given metallurgical grade coal from the Black Creek seam, which coal was underground. Outcropping of this grade of coal was classified as HCE 551 OC. A second classification was HCE 552 which is coal from the Jefferson seam. A fourth classification is HCE 554.
"8. From time to time after August 31, 1981, MOE would receive shipments of coal and credit to Enterprises' account on the purchase of the D-9, sums of money reflecting MOE's purchase of the coal. By way of example, on October 8, 1981, MOE credited to the D-9 purchase account $5,821.08 for HCE 551 coal delivered between October 1, 1981 and October 15, 1981, plus $801.71 for HCE 552 coal delivered during that period. Those credits reduced the balance owed on the purchase of the D-9 to $86,617.55. By February 28, 1982, the balance owed by Enterprises to MOE for the D-9 was $46,539.77.
"9. In December, 1981, Enterprises entered into a joint venture with McClarty whereby McClarty would mine the coal and cause it to be delivered to purchasing customers, MOE being the principal customer. Employees of MOE visited the mining area on a regular basis to inspect the work being performed by McClarty. Twice monthly MOE would issue its checks payable jointly to McClarty and Cook for purchases of coal delivered. By way of example, on March 16, 1982, MOE issued its check to McClarty and Cook in the amount of $29,271.55 for 606.79 tons of # 552 shipped during the period of February 16, 1982 to February 28, 1982, and $15,569.46 for 322.75 tons of # 552 shipped during that period.
"10. Fred Layne is a vice-president of and coal buyer for MOE. In negotiating with Layne for MOE's purchases of the coal, Cook and Layne agreed that MOE would inspect the coal as mined and any coal delivered to MOE at its yard in Wylam, Alabama, would not be rejected after delivery. When Layne had occasion to learn that McClarty had sold three loads of coal to Mann Steel Products, Inc., for the coke plant operated by Koppers Company, Inc., Layne insisted that McClarty and Cook sell all Black Creek coal mined by McClarty to MOE.
"11. The Wylam Coal yard of MOE is on property owned by United States Steel Corporation, (herein `USS'). USS has been a major customer of MOE for coal used by USS to make coke. Three or four days after March 31, 1982, USS ceased buying coal from MOE.
"12. On March 25, 26, 27, 29, 30 and 31, 1982, McClarty shipped sixty-four (64) loads of coal to MOE at its Wylam yard at an agreed price of $116,658.35. This coal was not paid for by MOE on April 16, 1982, as was the custom and agreement of the parties. On April 16, 1982, Jenkins telephoned Layne to inquire about payment and was told by Layne that Jenkins and Cook should come to the offices of MOE to talk about a `problem'. At that meeting MOE informed Jenkins and Cook it was not going to pay for the coal because it did not have a customer for it and because it had not been analyzed as to sulphur, oxidation, ash and other properties.
"13. At no previous time had the parties discussed or agreed to any `specification' for the coal to be delivered to and purchased by MOE, all coal being mined was being inspected and known to MOE before shipment.
"14. On March 31, 1982, the last day of shipment, I.J. Murphy, an employee of MOE, was at the mining area where he inspected coal, telephoned Layne for authorization *632 to take the coal, and six loads of # 554 coal weighing 214 tons were delivered that day to MOE's yard. Upon receipt of the coal at its Wylam yard MOE would have the coal tested for content of ash, sulphur, water and oxidation. However, MOE's agreement to purchase the coal from McClarty was not subject to any specifications. Coal sold by MOE to USS for use in making coke was required to meet certain maximum limits as to content of ash, sulphur, and as to oxidation. MOE would blend coal received by it from several sources to meet the USS specifications at the Wylam yard before delivering it to USS.
"15. Attached to this complaint are three pages furnished by MOE to plaintiffs that reflect sales of coal to MOE during the first half of March, 1982, showing the dates of receipt, the tonnage received, the classification, and the amount of $105,936.97 due for the purchase of # 551 and # 551 outcrop, less $2,305.76 for sales price of a light system MOE sold to Enterprises. These statements contain nothing but blank space in the section opposite the words `contract specs'.
"16. On April 19, 1982, Jenkins and Cook went to the meeting demanded by Layne at the Wylam yard, where they were shown around by Julius D. Hill, MOE's plant superintendent, and learned MOE had no customers for the coal on its yard. There were some 50,000 tons of coal on the yard in three separate piles. The next day, Jenkins and Cook went back to MOE offices in an effort to collect the money for the coal and were told the coal had to be analyzed.
"17. On visiting MOE on April 22, 1982 to collect the money due, Jenkins and Cook were informed Layne was out of the office for a meeting. On April 23, 26 and 27, Jenkins and Cook made further trips to MOE to collect the money being told various stories about the analysis of the coal being incomplete. On April 27, 1982, Jenkins demanded to know if MOE was going to pay for the coal and was told to return the next day.
"18. On April 28, 1982, the Treasurer of MOE, Thomas E. Walker, Jr., issued two MOE checks to McClarty and Cook, one for # 554 coal shipped on March 25 and 26, and the other for # 551 coal shipped on March 31. As Jenkins and Cook drove away from the MOE offices, they saw that Walker had typed on the back of each check the words, `The negotiation of this check releases Mining, Ore and Equipment Company, Inc. from all claims.' They returned to Walker with the check. Walker then agreed to limit the restriction to the specific shipments of coal described in the preceding paragraph on condition that McClarty take back the remaining coal on assurances the remaining McClarty coal on the MOE yard would be removed. To get the badly needed $23,425.00 to pay to pressing creditors of McClarty and Enterprises, and while acting under duress, Jenkins and Cook took the checks and they were negotiated by McClarty.
"19. On April 30, 1982, McClarty wrote a letter to MOE demanding payment of the balance of $93,233.35 that was due to it and Cook on April 15, 1982, as per the agreement of the parties. On May 7, 1982, MOE wrote McClarty saying the coal was rejected due to oxidation and informed McClarty it had until May 18,1982, to pick up the coal or otherwise suffer loading and storage charges.
"20. Since this dispute arose, and after MOE's attorneys were advised in writing of the statements and facts set forth above, MOE's attorneys wrote Cook the letter attached hereto claiming Enterprises has breached an agreement to lease the D-9, thereby impliedly denying the sale of the D-9 to Enterprises.
"WHEREFORE, plaintiffs invoke the jurisdiction of the Court as provided by §§ 6-6-220, et seq., Code of Alabama (1975) and pray that it will enter judgment as follows:"
McClarty is seeking to recover the purchase price for coal which McClarty had mined and shipped to MOE. MOE claims it was not obliged to pay for the shipments because the coal failed to comply with quality *633 specifications orally agreed to by the parties. McClarty claims that quality specifications were never discussed nor agreed upon and that MOE had inspected and accepted the coal prior to shipment.
McClarty sought discovery by propounding interrogatories to MOE. In response to MOE's answers to these interrogatories, McClarty filed a motion to compel answers to the following three questions to which MOE had objected:
Interrogatory No. 1: "What is the name and address of each entity that sold coal to you on and after March 1, 1981?"
Answer: "Counsel for MOE objects to this interrogatory on the grounds that it asks for information not relevant to the subject matter involved in the pending action and therefore not within the scope of discovery under Rule 26(b)(1) of the Alabama Rules of Civil Procedure. Counsel for MOE also objects to this interrogatory on the ground that it is overly broad, oppressive, and because preparing an answer would be unduly burdensome and expensive."
Interrogatory No. 2: "What is the name and address of each entity to whom you sold coal on and after March 1, 1982?
Answer: "See answer to interrogatory number one."
Interrogatory No. 3: "Do you now, and did you have on March 1, 1981, a written contract to sell coal to United States Steel Corporation?"
Answer: "See answer to interrogatory number one."
The trial court found that the information sought was not relevant to the subject matter of the case and not reasonably calculated to lead to discovery of admissible evidence as required by Rule 26(b)(1), A.R. C.P. Dissatisfied with this ruling, McClarty now petitions this Court to issue a writ of mandamus which would direct the trial court to vacate the denial and compel MOE to answer the interrogatories.
The broad scope given discovery rules necessarily requires that the trial court be vested with considerable discretion in ruling on discovery matters. Drewes v. Bank of Wadley, 350 So.2d 402 (Ala.1977). Correspondingly, "[t]he question on review then becomes one of whether, under all of the circumstances, the trial court has abused this discretion." Campbell v. Regal Typewriter Co., Inc., 341 So.2d 120 (Ala. 1976).
To determine whether an abuse of discretion occurred, we must examine petitioners' claim that the information requested is relevant.
Rule 26(b)(1), A.R.C.P., states in part:
"Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action .... It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence."
The petitioners assert that the trial court abused its discretion in precluding the discovery of information which would serve to disclose whether it is customary for buyers of coal to demand compliance with quality specifications. According to the petitioners, this information is relevant because an existing custom in the coal industry would operate to explain the meaning and intention of the contracting parties in regard to such specifications.
The central issue raised by the parties is what was their agreement regarding the shipment and payment for coal delivered and what quality specifications were agreed upon.
As stated in East Tenn., Va. & Ga. R.R. Co. v. Johnston, 75 Ala. 596 (1884):
"... Where there is an express contract, parol evidence of a usage is admissible to explain terms ambiguous or doubtful in signification, or from which to infer the intention, understanding and agreement of the parties, and to incorporate a stipulation or element, wherein the contract is silent; in such case, the usage or custom becomes a part of the contract.Barlow v. Lambert, 28 Ala. 704 [65 Am.Dec. 374].

*634 "`The proper office of a custom or usage in trade is to ascertain and explain the meaning and intention of the parties to a contract, whether written or parol, which could not be done without the aid of this extrinsic evidence. It does not go beyond this, and is used as a mode of interpretation on the theory that the parties knew of its existence, and contracted with reference to it.'Barnard v. Kellogg, 10 Wall. 383 [19 L.Ed. 987]."[1] (Emphasis added.)
Likewise, under Code 1975, § 7-2-202, the following is provided:
"Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:
"(a) By course of dealing or usage of trade (section 7-1-205) or by course of performance (section 7-2-208) ...." (Emphasis added.)
An existing custom as to quality specifications demanded by buyers of coal would indeed be relevant to the issues in this case. The information sought by the petitioners need only serve to establish custom, course of dealing, or conceivably in some instances habit, or at least appear reasonably calculated to lead to the discovery of other relevant and admissible evidence. See, Petroff v. Arbona, 336 So.2d 178 (Ala.1976); Gamble, McElroy's Alabama Evidence (3rd Ed.1977) § 42.01.
"It is the court's job .... to exercise its broad discretion [concerning discovery matters] in a manner that will implement the philosophy of full disclosure of relevant information and at the same time afford a party, or others, maximum protection against harmful side effects which would result from unnecessary disclosure." Ex parte Guerdon Industries, Inc., 373 So.2d 322 (Ala.1979).
We are of the opinion that the trial court abused its discretion, because we are unable to find that the production of this information is over-burdensome and because the information sought is either relevant or reasonably calculated to lead to the discovery of other admissible evidence to show course of dealing or custom and usage in the trade.
Respondents' argument dealing with the doctrine of res inter alios acta is unpersuasive in this instance.
The writ of mandamus is therefore due to be granted.
WRIT GRANTED.
TORBERT, C.J., and FAULKNER, EMBRY and ADAMS, JJ., concur.
NOTES
[1] While the respondent cites Drewes, supra, in support of the contention that evidence of custom would not be admissible or lead to admissible evidence under Rule 26(b)(1), A.R.C.P., we view Drewes as distinguishable from the case at bar. In the Drewes case, custom, if admitted, would have altered an express term of a written contract. See, Jewell v. Jackson & Whitsitt Cotton Co., 294 Ala. 112, 313 So.2d 157 (1975).