313 So.2d 157

**Jake JEWELL**

v.

**JACKSON & WHITSITT COTTON CO.,
a copartnership.**

**SC 1014.**

Supreme Court of Alabama.

May 8, 1975.

Rehearing Denied June 5, 1975.

J. Garrison Thompson, Selma, for appellant.

W. W. Dinning, Demopolis, for appellee.

**114**

MERRILL, Justice.

Plaintiff, Jake Jewell, brought a declaratory judgment action seeking the interpretation of a contract wherein Jewell agreed to sell all the cotton produced on 142.6 acres to defendant, Jackson & Whitsitt Cotton Co. This is an appeal by Jewell from a decree rendered in favor of the defendant.

Plaintiff is a cotton farmer. He primarily uses a planting method known as 2 and 1 skip row. Under this method, two rows are planted in cotton and every third row is left vacant, or skipped. The vacant row gives each plant more room to grow and obtain moisture. As a result, skip row cotton produces a higher yield *per plant* than does solid row cotton. Skip row planting, however, yields about the same amount of cotton *per acre* as solid row planting since there are fewer plants per acre, e. g., 100 acres planted in skip row produces approximately the same amount of cotton as 100 acres of solid row cotton.

About six weeks before the execution of the subject contract, Jewell applied for and received a cotton allotment from the Agricultural Stabilization and Conservation Service of the U.S. Department of Agriculture (A.S.C.S.). Jewell filled out A.S.C.S. form 516, "Intention to Participate and Payment Application," in which he stated that he expected to produce a yield of 690 pounds of cotton per acre.

The projected yield figure is calculated by the A.S.C.S. from an average of the actual yield of the cotton farmer for the three preceding years. The projected yield may vary considerably from the actual yield due to weather and environmental factors.

The projected yield per acre deviates from the actual yield per acre in another respect. The A.S.C.S. computes cotton allotment acreage in terms of "solid" acres. A skipped row, ditch, or other uncultivated area is not considered in computing "solid" acres planted for cotton allotment purposes. The A.S.C.S. calculates the number of "solid" acres of land planted by multiplying the number of acres of land planted in 2 and 1 skip row by .67. Thus, where the 2 and 1 skip row method is used, the projected yield per "solid" acre for A.S.C.S. cotton allotment purposes is appoximately ⅓ greater than the actual yield per acre.

On April 17, 1973, Jewell entered into the contract with Jackson & Whitsitt through Allen Small, officer manager of the Selma Compress Company, to sell part of his cotton to them for 35¢ per pound. Actually, the contract reads "35.00 per pound gin run" but the parties agree that

the trade was 35¢ per pound. The contract provided in pertinent parts as follows:

"* * * the SELLER agrees to sell and the BUYER agrees to buy at prices and terms as stated below. All and only the cotton produced by Jake Jewell Dallas County, Ala. during the crop year 1973 on approximately 150 acres located in ———————————————————.

* * * * * *

"The SELLER agrees to practice normal good farming methods in the production and harvesting of the crop, * * *."

At the bottom of the contract, below the parties' signatures, appeared the following:
"Farm Number: I 8

"Projected Yield: 690"

[About two or three weeks later, Jewell asked Small to change the acreage from 150 acres to 142.6 acres, which corresponded to Jewell's cotton allotment, and this was done].

Jewell denied that the amount of the projected yield, 690 pounds, was on the contract when he signed it. Small testified that he secured the information as to the projected yield, 690 pounds, from Jewell, and that it was on the contract at the time that Jewell signed the contract.

Pursuant to the contract, Jewell planted, grew and harvested a skip row cotton crop on 142.6 acres of land and delivered 143 bales of cotton with an average net weight of 475 pounds to Selma Compress Company, a bonded warehouse, for the account of Jackson & Whitsitt. Jewell also planted skip row cotton on 140 additional acres from which he harvested 127 bales. This cotton was delivered by Jewell in his own name to Selma Compress.

When Jewell attempted to sell the additional 127 bales, the Compress Co. "refused to allow the samples to be placed on the table for sale" because Jackson & Whitsitt claimed a portion of the additional bales. That day, cotton was selling between 68¢ and 72¢ per pound in Selma.

Plaintiff then filed this declaratory judgment action claiming that he was entitled to the additional 127 bales of cotton.

Jackson & Whitsitt based its claim upon an alleged custom and usage of the cotton trade that the number of acres expressed in the contract contemplated "solid" acres of cotton, according to the calculations of the A.S.C.S.

After hearing the evidence ore tenus, the trial court decreed as follows:

"Wherefore, in consideration of the facts set out above, and of the laws applicable thereto, it is the Opinion of the Court, and it is hereby Ordered, Adjudged and Decreed by the Court that the Plaintiff is estopped from denying that he intended to contract with Defendant to produce an average of 690 pounds per acre; that Plaintiff is therefore bound in Equity, and plaintiff is hereby ordered, to deliver to Defendant a total amount of cotton, amounting to 690 pounds multiplied by 142.6 acres, being 98,494 pounds; that Plaintiff has already delivered to Defendant 67,922 pounds of cotton, leaving a balance of 30,472 pounds of cotton which Plaintiff is hereby ordered to deliver to Defendant; since said cotton is stored at Selma Compress Company, it is further ordered that Selma Compress Company shall deliver said 30,472 pounds of cotton presently held in the name of the Plaintiff, Jake Jewell, to the Defendant, upon payment by Defendant to Selma Compress Company, for the benefit of the Plaintiff, the sum of 35 cents per pound for said 30,472 pounds. If it is necessary to deliver a number of pounds more than 30,472 in order not to split the bales of cotton, in that event the Defendant shall pay the current market price to Selma Compress Company, for the benefit of the Plaintiff, for all cotton included in said final bale which amounts to an excess, in the aggregate, above said 30,472 pounds. The balance of the cotton held by Selma Compress Company and produced by the Plaintiff shall be free of

any claim by the Defendant and the Selma Compress Company shall dispose of same as directed by the Plaintiff."

Regardless of Jewell's denial, we treat the contract as having shown the figures "I 8" and "690" on the lines under the signatures to have been there when Jewell executed the contact.

We first consider what is plain and undisputed about the contract. The buyer, Jackson & Whitsitt Cotton Co., agreed to pay 35¢ per pound for "all and only the cotton" produced by Jewell on the 142.6 acres which was the amount of his cotton allotment on his homeplace. Jewell did "practice normal good farming methods" in producing and harvesting the crop, and he produced 143 bales of cotton on the 142.6 acres which were delivered to the Compress Co. to the account of the buyer. It was also undisputed that the 2 and 1 skip row method is a good farming practice, and the production in bales or pounds of cotton therefrom is equal or better than that produced on comparable land in solid rows. It is also undisputed that had Jewell used the solid row method of planting on the 142.6 acres in the contract, there would have been no claim for more cotton.

◼ Generally, where a person by his contract charges himself with an obligation possible to be performed, he must perform it, unless its performance is rendered impossible by the act of God, by the law, or by the other party. Kamburis v. Stearns, 226 Ala. 171, 145 So. 449.

Under the factual situation up to this point and the applicable law, Jewell had performed his part of the contract unless the figures "I 8" and "69" added additional obligations.

The letter and figure "I 8" was the number given to Jewell's farm by A.S.C.S. each year in connection with his cotton allotment. The fact that it was there signified that Jewell's farm had a number and cotton allotment. There was not one word in the contract which tied the contract to

any rules and regulations of A.S.C.S. which might be used to figure the basis of the payment of the allotment to Jewell.

The figure "690" was the projected yield of cotton per acre according to the records of A.S.C.S. This was not a figure based on hope or optimism of the farmer, but was based upon past performance. It was explained by appellee's expert witness, Dr. Louis J. Chapman, Cotton Specialist and Agronomist in charge of Extension Educational Program for Cotton Production for the State of Alabama, when asked what the term "projected yield 690" meant to him in the cotton business:

"The term means to me projected yield. 690 means that the farmer has a three year history of 690 pounds of lint per acre calculated on a solid equivalent basis, pure and simply."

Dr. Chapman also testified that the cotton was not bought and sold on the projected yield, but the projected yield furnished a general idea on which the buyer could base his calculations:

"Q What would he be calculating on?

"A Well, he might use this projected yield as a basis, as a general idea of how much cotton to expect; but there's so many things that can affect cotton yield that while he may have a projected yield for a three year history of 690 pounds per acre, he might have a drought this year and produce only 400 pounds, but he may well use this as a general—

"Q (Interposing) 690 is a general figure?

"A It is a general figure of what he might well expect from—

"Q (Interposing) To sell on?

"A To sell on, right."

Appellee's buyer, Peter Coleman, who handled and signed Jewell's contract after it had been filled in by Small, testified on direct examination:

"Q Why is it necessary for them to know what the projected yield and the number of acres are?

"A The projected yield is a guide so they can anticipate what the production will be on this particular farm or this particular contract."

Coleman also agreed that the actual yield could vary from 690 to 450 pounds of lint cotton per acre and conceded that there was nothing in the contract about skip-row cotton.

Thus, it appears that the figures "I 8" and "690" were on the contract for identification and informational purposes, and common sense is a sufficient basis for the fact that crops are not bought and sold on a projected yield, but on the actual yield.

The only way appellee could hope to tie the "690" to the contract was under custom and usage. Appellee produced several cotton buyers who testified to the customs and usages. But custom and usage is a two-way street.

■ A usage or custom to be admissible in explanation of the terms of a contract which are ambiguous or doubtful in signification must be reasonable, must not contravene or displace any of the general principles of statutory or common law, or vary the express terms of the contract, *and must be brought home to the knowledge of the party sought to be charged, either by proof of actual notice, or by proof of its existence sufficiently long to raise a presumption of knowledge.* Mall Gift Cards, Inc. v. Wood, 288 Ala. 355, 261 So. 2d 31.

In Wye Shipping Co. v. Hunter, Benn & Co., 211 Ala. 326, 100 So. 475, this court said:

"Defendant offered proof tending to show that it was customary at the gulf ports to render such accounts in the manner treated by the defendant in this case. There is nothing, however, to show any knowledge on the part of the plaintiff of any such custom, nor that it was so generally known as to justify the presumption that the parties knew of it, and contracted with reference thereto. * * *"

It is undisputed that this contract in 1973 was the first time Jewell had ever contracted or booked his cotton crop; he was not aware of any custom or usage relating to the contracting of a cotton crop; the first time he ever heard of it was when this case came up; he was not aware of any custom or usage when he signed the contract. He was not alone in this lack of knowledge. Other cotton farmers in the area, Robert Sanford (1,325 acres), T. E. McHugh (600 acres) and Furniss Ellis (no acreage shown) testified that they knew of no custom or methods in connection with the measuring of acreage in booking cotton for sale at a specified price. Lawrence Alsobrook, County Extension Chairman, also knew of no such custom or usage.

■ Another rule is that a contract is construed more strongly against the party who drew it. Travelers Ins. Co. v. Kernachan, 283 Ala. 96, 214 So.2d 447. And in Alabama-Tennessee Natural Gas Co. v. City of Huntsville, 275 Ala. 184, 153 So.2d 619, this court said:

"* * * It is a rule of long standing that the courts will construe doubtful terms in a contract more strongly against the party who framed or prepared them, and when the instrument is capable of two constructions, it should receive that which is most unfavorable to the maker. * * *"

This contract was presented to Jewell by Allen Small after Small had filled some of the blanks on a typewriter and Jewell supplied Small with his name, the number of his allotment acres, the A.S.C.S. farm number and his projected yield. The contract is both uncertain and incomplete but it was made certain by agreement of both parties except as to when the figures "I 8"

and "690" were affixed and whether or not the addition of those figures automatically incorporated all the terms and methods of computing the cotton allotment of Jewell in his contract with A.S.C.S. There was plenty of blank space on the contract to list any or all conditions of the A.S.C.S. contract, but they were not included.

We find no reason to disagree with any of the items in the trial court's "Finding of Fact" and we do not include it in this opinion.

■ We do disagree with the application of the law to those and other facts which we have included in this opinion. In view of Jewell's lack of knowledge of any custom or usage and the failure of appellee to bring it to his attention either by reference in the contract or other explanation, we are constrained to hold that the court erred in requiring that "a total amount of cotton, amounting to 690 pounds multiplied by 142.6 acres" be turned over to appellee by Jewell. Instead, the decree or order should provide that the 143 bales of cotton produced on Jewell's cotton allotment acreage (142.6 acres) be adjudged as the performance and settlement in full by Jewell under the contract in issue, and that the remaining 127 bales produced on the 140 additional acres be adjudged free of any claim by appellee.

■ In summary, we hold that the addition of "I 8" and "690" to the blank spaces on the contract did not mean that the A.S.C.S. method of computing cotton allotment between the grower and the Department of Agriculture was to be used in the contract between Jewell and the cotton buyer.

Affirmed in part, reversed in part and remanded with directions.

HEFLIN, C. J., and MADDOX, JONES and SHORES, JJ., concur.