**FOXCO INDUSTRIES, LTD.,**
**Plaintiff-Appellee,**

v.

**FABRIC WORLD, INC.,**
**Defendant-Appellant.**

No. 76–2820.

United States Court of Appeals, Fifth Circuit.

May 22, 1979.

---

John R. Wynn, Harold F. Herring, Huntsville, Ala., for defendant-appellant.

John Z. Higgs, Jr., Huntsville, Ala., for plaintiff-appellee.

Before RONEY, TJOFLAT and HILL, Circuit Judges.

TJOFLAT, Circuit Judge:

In this diversity action Foxco Industries, Ltd. (Foxco), a Delaware corporation, following a jury trial recovered a $26,000 judgment against Fabric World, Inc. (Fabric World), an Alabama corporation, for breaching a contract to purchase certain knitted fabric goods and refusing to pay for merchandise previously purchased.[1] Fabric World raises three points on appeal: (1) Foxco was "doing business" in the state of Alabama without having qualified to do so and thus was precluded from enforcing its claim in court; (2) the district court erred in its instructions to the jury on damages; and (3) the district court erred in admitting into evidence published standards of the Knitted Textile Association to establish the meaning of a disputed contract term. For the reasons set forth below, we reject the arguments of Fabric World and affirm.

I

Foxco is in the business of manufacturing knitted fabrics for sale to retail fabric stores and the garment industry. Foxco's principal place of business is in New York City; it has never formally qualified to do business in Alabama. Fabric World is engaged in the retail fabric business and oper-

ates a chain of stores in a number of states; its headquarters is in Huntsville, Alabama.

There are two seasons in the fabric industry, a spring season and a fall season. Before the beginning of each season Foxco displays for customers samples of the line of fabrics it will manufacture that season. Customer orders are accepted only from the fabric shown on display. Foxco's manufacturing operation is limited to filling these orders; no fabrics are manufactured merely to be held as inventory. There was some conflict in the testimony as to whether fabric specially knit for one customer, such as Fabric World, could be resold to another customer.

Foxco sells some of its goods to retail fabric stores through manufacturers' representatives, operating on a commission basis, who sell the lines of numerous manufacturers. Foxco furnishes each representative with samples and a price list. Larger retail store customers, such as Fabric World, are handled personally by Foxco's sales manager, Allen Feller, a salaried employee, who supervises all retail fabric store sales. He has responsibility over the approximately twenty-six manufacturers' representatives carrying the Foxco line.

Foxco has never maintained an office in Alabama. At the time of the transactions giving rise to this action, its manufacturers' representative in Alabama was a resident of the state. Foxco's sales manager, Feller, made periodic trips to Alabama to meet with this representative and to obtain orders from Fabric World and Kennemer Company, another large fabric retailer. At the beginning of each season Feller would meet with the manufacturers' representative for two or three days so that the new line of fabrics could be previewed and discussed. In 1974, Foxco's gross sales approximated $14,000,000; Alabama accounted for in excess of $100,000 of that amount. A substantial portion of the Alabama business was with Fabric World, from which three separate orders were obtained.

---

1. Foxco also claimed that Fabric World tortiously injured Foxco's business reputation. That claim was dismissed at trial at the close of the evidence and is not involved in this appeal.

On April 22, 1974, Feller traveled to Huntsville to show Fabric World the new fall line. His meeting with Glenn Jameson, Fabric World's president, culminated in a written order for "first quality" goods. A dispute subsequently arose regarding the quality of the goods sent to fill the order, and Fabric World refused to pay for the portion of the goods it considered defective.

On October 21, 1974, Feller returned to Huntsville to show Jameson the line for the following spring season. Jameson voiced no complaint about the quality of the goods received pursuant to the previous April 22 order. In fact, he gave Feller a new order, in writing, for 12,000 yards of first quality fabric, at a price of $36,705, to be delivered by January 15, 1975.

A few weeks after the October 21 order was placed, the textile industry began to experience a precipitous decline in the price of yarn. Because of a drop in the price of finished goods, Fabric World wrote Foxco on November 15, 1974, and cancelled its October 21 order. Foxco immediately replied, stating that the manufacture of the order was substantially completed and that it could not accept the cancellation. On November 27, 1974, Foxco's attorney wrote Fabric World that if the goods were not accepted they would be finished and sold and Fabric World sued for the difference between the contract price and the sales price received by Foxco. On December 3, 1974, Fabric World agreed to accept the order, but threatened to return the entire shipment if it contained one flaw. Foxco, believing that it was impossible to produce an order of this magnitude without a single flaw, decided it would not ship the order (which was completed a short time later).

Fabric World established that in December 1974 the fair market value of the October order was approximately 20% less than the contract price. However, Foxco made no attempt to sell the goods from the time Fabric World cancelled the order until September 1975, when the goods had dropped 50% in value. In that month Foxco sold at a private sale without notice to Fabric World approximately 7,000 yards from the order for an average price of between $1.50 and $1.75 per yard, a total consideration of $10,119.50. By the time of trial in April 1976, Foxco had on hand about 5,000 yards of the order worth between $1.25 and $1 per yard, or about $6,250.

During the course of the trial there was much testimony regarding the meaning of the term first quality goods used in the contracts between Foxco and Fabric World. The testimony on behalf of Fabric World was that it meant fabric containing no flaws. Foxco introduced evidence, over the objection of Fabric World, in the form of an exhibit containing standards for finished knitted goods promulgated by the Knitted Textile Association, a large textile industry group to which Foxco belongs. These standards indicated that certain types and amounts of flaws were permissible in first quality fabric. Fabric World is not a member of that association and claimed it had no knowledge of the standards adopted by the association's members. One ground for Fabric World's present appeal is its contention that the standards of a trade association of which it had no knowledge are not admissible to show the meaning of the undefined and disputed contract term "first quality" goods.

In its final charge to the jury, the district court instructed that Foxco was not doing business in Alabama and that the doing business issue had been eliminated from the case. Fabric World claims the instruction was error.

The court also instructed the jury that, if it found that Fabric World was liable to Foxco, it was free to calculate Foxco's damages under either section 2–708 or 2–709 of the Alabama Uniform Commercial Code. Fabric World objected, asserting that section 2–709 is inapplicable in this case, and now argues that the verdict resulted from an application of that section.

## II

Under Alabama law, if a foreign corporation does business in Alabama without being duly qualified to do so, it is precluded from enforcing in state court "all

contracts or agreements" made or entered into by it in Alabama. Ala.Const. art. XII, § 232; Ala.Code tit. 10, § 10–2–254 (1977). A foreign corporation barred from suit in Alabama state court because of its failure to qualify to do business is similarly barred from bringing its claim in a diversity action in federal district court. *Associates Capital Services Corp. v. Loftin's Transfer & Storage Co.*, 554 F.2d 188, 189 (5th Cir. 1977). Thus, if Foxco were doing business in Alabama such that it would be barred from the state courts, the judgment below could not stand.

The district court held that under the facts of this case Foxco was not doing business in Alabama. It cited *Swicegood v. Century Factors, Inc.*, 280 Ala. 37, 189 So.2d 776 (1966), as authority for its decision. In that case, the court held that a foreign corporation, based in New York, that solicited orders by sending a sales representative to Alabama to demonstrate the corporation's product, was not doing business in Alabama. In our view, the district court correctly applied *Swicegood* and other relevant Alabama case law; moreover, the court's conclusion has been reinforced by subsequent Alabama decisions.

■ The determination whether a foreign corporation is doing business within the state of Alabama involves a mixed question of law and fact. *Id.* at 38, 189 So.2d at 778. Consequently, "the facts of each case are quite important in determining whether or not a sufficient nexus exists for finding that the nonresident corporation is doing business within the state." *SAR Manufacturing Co. v. Dumas Brothers Manufacturing Co.*, 526 F.2d 1283, 1285 n. 3 (5th Cir. 1976).

■ In the case before us, Foxco has neither salaried employees nor offices in Alabama. Most of its Alabama sales are solicited by a commissioned sales representative who represents many manufacturers. On occasion Foxco's sales manager, a salaried employee, travels to Alabama from New York to meet with the sales representative and to solicit orders from a few large customers. Of Foxco's $14,000,000 nationwide sales in 1974 a little over $100,000 came from Alabama. Under current Alabama law these basic facts do not establish the elements necessary to bar Foxco from district court in this case.

In the past we have approached the Alabama doing business statutes with a two-step inquiry: (1) is the foreign corporation doing business in Alabama and (2) if so, will the application of the Alabama law barring suit impede interstate commerce in violation of the commerce clause of the Constitution. *Id.* at 1284. In this case we need merely inquire whether Foxco's activities in Alabama are in the course of *interstate* or *intrastate* commerce. *See* Ala.Code tit. 10, § 10–2–256 (1977). If they are *interstate* in nature, the Alabama statutes do not apply; if the corporation is acting in *intrastate* commerce, its suit in Alabama is barred. *Id.*; *see Kentucky Galvanizing Co. v. Continental Casualty Co.*, 335 So.2d 649 (Ala. 1976); *First Investment Co. v. McLeod*, 363 So.2d 774 (Ala.Civ.App.1978). The facts underlying these two cases make it clear that Foxco was acting only in interstate commerce.

In *Kentucky Galvanizing Co.* the court held the following activities of a foreign corporation to be in interstate commerce:

> Galvanizing is a foreign corporation which manufactures products outside the state and ships to customers in the state . . . these sales were arranged through solicitation by one of the corporation's agents . . . the agent made monthly trips into this state for that purpose and . . . during those trips he would confer with customers and arrange or negotiate a sale. . . . [T]he sale would not be consummated in Alabama but through processing order blanks which would be forwarded to the corporate headquarters outside the state. This description of Galvanizing's activities denotes the interstate nature of Galvanizing's business dealings.

335 So.2d at 651–52. The court cited with approval *Swicegood v. Century Factors, Inc.* for the proposition that mere "business solicitations and incidents relative to such so-

licitations do not constitute transaction of business [by a foreign corporation] within the State of Alabama. Rather, these are interstate in nature." *Id.* at 651.

*First Investment Co. v. McLeod* questioned whether the sale of franchise agreements for the growing and selling of Christmas trees constituted doing business in the state. The court held that it did not, observing that the foreign corporation, "other than delivery of the trees, did nothing in Alabama except what is incident to soliciting sales of its franchising agreements for the sale and delivery of Christmas tree seedlings." 363 So.2d at 777. The court concluded that the corporation was acting in interstate commerce even though it was bound to furnish expert help, equipment, and advice to its Alabama franchisee. The court considered these extra activities in Alabama to be "merely incidental attributes of the main undertaking . . . which was the sale and delivery of Christmas tree seedlings to Alabama from another state." *Id.* The *First Investment Co.* court cited with approval the holding of *Improved Machinery, Inc. v. Delta Molded Products, Inc.* (*In re Delta Molded Products, Inc.*), 416 F.Supp. 938 (N.D.Ala.1976), *aff'd sub nom. Sterne v. Improved Machinery, Inc.*, 571 F.2d 957 (5th Cir. 1978). In *Delta Molded Products*, representatives of a foreign corporation came to Alabama to meet with representatives of a local firm. A contract was readied in Alabama whereby the foreign corporation, in addition to selling machinery to the firm, agreed to furnish experts to assemble the machinery and put it in operation, train the firm's employees, and perform both warranty and non-warranty maintenance and repairs. Despite the conduct of all these activities within the state, the district court held that the foreign corporation was acting only in interstate commerce.

In our view, the facts of the case at hand clearly fit into the pattern evidenced by *Kentucky Galvanizing Co., First Investment*

*Co.,* and *Delta Molded Products.* As we have stated, Foxco's Alabama activities consisted of the solicitation of orders and the subsequent delivery of the ordered goods. Assuming that the contracts between Foxco and Fabric World were made in Alabama,[2] *Delta Molded Products* indicates that this fact alone does not take Foxco beyond the protected stream of interstate commerce. Foxco's activities differ from those in cases such as *SAR Manufacturing Co.*, where, in addition to the solicitation of business in Alabama, the foreign corporation opened a warehouse in Alabama to service the needs of a local corporation, hired seven employees and processed some of its product in Alabama, and maintained two vehicles there. *See Kentucky Galvanizing Co., Inc. v. Continental Casualty Co.*, 335 So.2d at 652. We are not here presented with a case where Foxco's activities "are localized enough to easily fall under the ambit of a series of transactions which are primarily intrastate . . . ." *SAR Manufacturing Co. v. Dumas Brothers Manufacturing Co.*, 526 F.2d at 1286 (footnote omitted). Consequently, "[Foxco], conducting business in interstate commerce, is justified and welcomed to use [a federal diversity court] to enforce its claim against those who defaulted on payment of an order which was delivered [in Alabama] [and breached a contract to purchase goods]." *Kentucky Galvanizing Co. v. Continental Casualty Co.*, 335 So.2d at 652. *See generally* Fleming, *Defense of a Contract Action Based on the Failure of the Plaintiff Foreign Corporation to Have Qualified to Do Business in Alabama*, 38 Ala.Law. 223 (1976).

### III

■ We now turn to Fabric World's argument that, while Foxco was entitled to have the jury charged under section 2–708 of the Alabama Uniform Commercial Code (U.C.C.), Ala.Code tit. 7, § 7–2–708 (1977), the instruction under section 2–709, Ala.

---

**2.** Throughout the proceedings below the parties took sharp issue as to the place where their contracts were entered into. Foxco claimed they were made in New York; Fabric World

insisted that Alabama was the situs. The district court considered the situs to be immaterial and so instructed the jury.

Code tit. 7, § 7–2–709 (1977), was improper.[3] At the outset, we note that we have been unable to locate any Alabama cases construing either of these provisions. Accordingly, we must anticipate the decision of an Alabama court faced with the questions now presented. We have no reason to believe that an Alabama court would not study relevant precedents from the other 48 jurisdictions which have adopted the U.C.C.; therefore, we look to those precedents for guidance.

Fabric World maintains that the $26,000 verdict awarded to Foxco cannot be supported by the district court's instruction under U.C.C. section 2–708, allowing the difference between the market and contract price as the measure of damages. Fabric World calculates that, in view of the market price at the time the October 1974 contract was breached, the maximum amount the jury could have given Foxco under the section 2–708 instruction was approximately $16,000,[4] $10,000 less than its $26,000 verdict. Accordingly, it reasons that the verdict must have been fashioned pursuant

to the section 2–709 charge and the verdict cannot stand unless that charge was proper. As we now discuss, the jury was appropriately instructed, and Foxco's damage award must be approved.

■ U.C.C. section 2–703, Ala.Code tit. 7, § 7–2–703 (1977), sets out the remedies available to the seller of goods against a defaulting purchaser:

*Seller's remedies in general.*

Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery or repudiates with respect to a part or the whole, then with respect to any goods directly affected and, if the breach is of the whole contract (section 7–2–612), then also with respect to the whole undelivered balance, the aggrieved seller may:

(a) Withhold delivery of such goods;

(b) Stop delivery by any bailee as hereafter provided (section 7–2–705);

(c) Proceed under section 7–2–704 respecting goods still unidentified to the contract;

3. Section 7–2–708 provides:

*Seller's damages for nonacceptance or repudiation.*

(1) Subject to subsection (2) and to the provisions of this article with respect to proof of market price (section 7–2–723), the measure of damages for nonacceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this article (section 7–2–710), but less expenses saved in consequence of the buyer's breach.

(2) If the measure of damages provided in subsection (1) is inadequate to put the seller in as good a position as performance would have done then the measure of damages is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer, together with any incidental damages provided in this article (section 7–2–710), due allowance for costs reasonably incurred and due credit for payments or proceeds of resale.

Section 7–2–709 states:

*Action for the price.*

(1) When the buyer fails to pay the price as it becomes due the seller may recover, together with any incidental damages under section 7–2–710, the price:

(a) Of goods accepted or of conforming goods lost or damages within a commercially

reasonable time after risk of their loss has passed to the buyer; and

(b) Of goods identified to the contract if the seller is unable after reasonable effort to resell them at a reasonable price or the circumstances reasonably indicate that such effort will be unavailing.

(2) Where the seller sues for the price he must hold for the buyer any goods which have been identified to the contract and are still in his control except that if resale becomes possible he may resell them at any time prior to the collection of the judgment. The net proceeds of any such resale must be credited to the buyer and payment of the judgment entitles him to any goods not resold.

(3) After the buyer has wrongfully rejected or revoked acceptance of the goods or has failed to make a payment due or has repudiated (section 7–2–610), a seller who is held not entitled to the price under this section shall nevertheless be awarded damages for nonacceptance under section 7–2–708.

Foxco invoked section 7–2–709(1)(b) in the court below.

4. Fabric World includes in this amount the unpaid balance due on its April 1974 purchase, which it assumes the jury was obliged to award Foxco under the court's charge.

(d) Resell and recover damages as hereafter provided (section 7–2–706);

(e) Recover damages for nonacceptance (section 7–2–708) or in a proper case the price (section 7–2–709);

(f) Cancel.

As Fabric World correctly argues, notwithstanding section 2–703(d) Foxco cannot invoke section 2–706, Ala.Code tit. 7, § 7–2–706 (1977), in this case because, following Fabric World's breach, Foxco privately sold some of the goods without notice to Fabric World. Thus, Foxco, having elected not to pursue the relief available under section 2–703(a), (b), and (f), is limited to its remedies under section 2–703(e), *i. e.*, either section 2–708 or 2–709. The district court charged the jury under both of these latter provisions, leaving to the jury the determination of which was more appropriately applicable under the facts developed at trial. Since Fabric World properly concedes that a section 2–708 instruction was warranted on the state of the record before the trial judge, we may reverse only if the evidence was insufficient for the jury to invoke section 2–709 as a measure of Foxco's damages.

▮▮▮ When Fabric World cancelled its October 1974 order on November 15, 1974, Foxco had not yet fully completed the manufacture of the contracted-for fabric. Under U.C.C. section 2–704, Ala.Code tit. 7, § 7–2–704 (1977), a seller aggrieved by a buyer's repudiation of unfinished goods may, in the exercise of reasonable commercial judgment and in order to avoid loss, either complete the manufacture and wholly identify the goods to the contract or cease their manufacture and resell them at their salvage value. As stated in the Official Comment to this section,

1. This section gives an aggrieved seller the right at the time of breach to identify to the contract any conforming finished goods, regardless of their resalability, and to use reasonable judgment as to completing unfinished goods. It thus makes the goods available for resale under the resale section, the seller's primary remedy, and *in the special case in which*

*resale is not practicable, allows the action for the price which would then be necessary to give the seller the value of his contract.*

*Id.*, Official Comment (emphasis added). The jury obviously decided that Foxco acted in a commercially reasonable manner when it decided to process to a conclusion the manufacture of the already substantially completed Fabric World order. Foxco was then entitled to the appropriate seller's breach of contract remedy.

U.C.C. section 2–709(1)(b), that portion of section 2–709 which would apply here, provides that an action for the price of goods may be maintained "if the seller is unable after *reasonable* effort to resell them at a *reasonable* price or the circumstances *reasonably* indicate that such effort will be unavailing." Ala.Code tit. 7, § 2–709(1)(b) (1977) (emphasis added). The Official Comment to section 2–709 states, in pertinent part, that:

2. The action for the price is now generally limited to those cases where resale of the goods is impracticable  . . . .

3. This section substitutes an objective test by action for the former "not readily resalable" standard. An action for the price under subsection (1)(b) can be sustained only after a "reasonable effort to resell" the goods "at reasonable price" has actually been made or where the circumstances "reasonably indicate" that such an effort will be unavailing.

Ala.Code tit. 7, § 7–2–709, Official Comment (1977). As was recognized in *Multi-Line Manufacturing, Inc. v. Greenwood Mills, Inc.*, 123 Ga.App. 372, 180 S.E.2d 917 (1971), a case involving the cancellation of a contract to purchase fabric, the language of section 2–709(1)(b) "clearly evinces legislative intent that these matters ordinarily should be subject to determination by a jury  . . . ." *Id.* at 373, 180 S.E.2d at 918. Thus, we will reverse only if, as a matter of law, there was no way in which the jury could find that Foxco was unable, after reasonable effort, to resell the fabric at a reasonable price or that it was reasonably clear that an effort to resell would have been fruitless.

The evidence at trial clearly established that all of Foxco's goods were specially manufactured for the customer who ordered them and that it was difficult for Foxco to resell fabric manufactured for one purchaser to another buyer. Further, it was normally very difficult to sell Foxco's spring fabric after the spring buying season had ended; the precipitous decline of the knitted fabric market presented an additional barrier to resale. It was not until the next spring buying season returned that Foxco, in September 1975, finally sold a portion of the goods identified to Fabric World's October 1974 order.

Fabric World argues that Foxco made no effort whatsoever to resell the goods during the months that intervened (between the contract breach and Foxco's eventual disposition of the fabric in September 1975) despite the presence of some market for the goods in that interim period. Thus, Fabric World concludes, the requisites of section 2–709(1)(b) were not satisfied. Under section 2–709(1)(b), however, Foxco was required only to use reasonable efforts to resell its goods at a *reasonable* price. From the time of Fabric World's breach to September 1975 there was a 50% decline in the market price of this material. We cannot say that the jury was precluded from finding that Foxco acted reasonably under the circumstances or that there was no reasonable price at which Foxco could sell these goods.[5] Fabric World breached its contract with Foxco, and the jury was entitled to a charge which gave Foxco the full benefit of its original bargain.[6] *See Tracor, Inc. v. Austin Supply & Drywall Co.*, 484 S.W.2d 446 (Tex.Civ.App.1972).

## IV

Fabric World's final claim is that the district court erred in admitting into evidence the definition of first quality goods contained in the Standards for Finished Knitted Fabrics of the Knitted Textile Association. It contends that it is not a member of the Knitted Textile Association, was unaware of its existence until the time of trial, and that that group's standards were inadmissible because they were a custom or usage of the trade of which Fabric World had no knowledge. We find no error in the trial court's ruling.

A major issue in this case is what was meant by the term "first quality." Under the traditional application of the parol evidence rule, Fabric World's contention may have merit: the private, subjective intent of one party to a contract may well be irrelevant in determining the meaning of a contract term unless it is shown that that intent was communicated to the other party. *See* Levie, *Trade Usage and Custom under the Common Law and the Uniform Commercial Code*, 40 N.Y.U.L.Rev. 1101 (1965). In this case there is no direct evidence, as Fabric World argues, that it was put on notice that usage and custom, as embodied in the industry standards, would be used to define the meaning of first quality. Under Alabama sales law, however, that Fabric World did not know of the industry's usage and custom or of the standards in question is of no moment; the parties to a contract such as the one in issue are *presumed* to have intended the incorporation of trade usage in striking their bar-

5. Fabric World points to *Cole v. Melvin*, 441 F.Supp. 193, 205 n.7 (D.S.D.1977), for the proposition that section 2–709(1)(b) cannot be applied in case of a plummeting market if there were *some* market for the relevant good. We note several points. First, *Cole v. Melvin* was a non-jury trial, so there was no issue whether a section 2–709 jury instruction was appropriate in that case. Moreover, the court noted that section 2–709 was inapplicable because the seller's attorney felt he could not produce evidence to support an action for the price; in the case before us Foxco presented evidence which made a section 2–709 jury instruction appropri-

ate. Finally, the proposition Fabric World draws from *Cole v. Melvin* was dictum.

6. This case differs from *French v. Sotheby & Co.*, 470 P.2d 318 (Okl.1970), because Foxco, unlike the seller in that case, *has* presented evidence which permits a finding that the tests of section 2–709(1)(b) have been met and that an action for the price is in order.

We reject Fabric World's argument that Foxco should be denied the application of section 2–709 because it was barred from the section 2–706 remedy. *See Wolpert v. Foster*, —— Minn. ——, 254 N.W.2d 348, 351–52 (1977).

gain.[7] U.C.C. section 2–202, Ala.Code tit. 7, § 7–2–202 (1977), explicitly provides that trade usages may help explain or supplement contract terms.[8] As stated in the comment to that provision,

> [Section 2–202(a)] makes admissible evidence of course of dealing, usage of trade and course of performance to explain or supplement the terms of any writing stating the agreement of the parties in order that the true understanding of the parties as to the agreement may be reached. *Such writings are to be read on the assumption that* the course of prior dealings between the parties and *the usages of trade were taken for granted when the document was phrased. Unless carefully negated they have become an element of the meaning of the words used.*

*Id.,* Official Comment (emphasis added). Section 1–205(2), Ala.Code tit. 7, § 7–1–205(2) (1977), defines trade usages. It provides in part that

> A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts.

It further states: "A course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement." Ala. Code tit. 7, § 7–1–205(3) (1977). There was

uncontroverted testimony that the Knitted Textile Association is an industry group with over 1500 members. Its standards could certainly qualify as trade usages, and thus were admissible notwithstanding Fabric World's unawareness of them.[9] *Loeb & Co. v. Martin,* 295 Ala. 262, 327 So.2d 711, 715 (1976). *See Columbia Nitrogen Corp. v. Royster Co.,* 451 F.2d 3 (4th Cir. 1971); *Chase Manhattan Bank v. First Marion Bank,* 437 F.2d 1040 (5th Cir. 1971); *Southern Concrete Services, Inc. v. Mableton Contractors, Inc.,* 407 F.Supp. 581 (N.D.Ga. 1975), *aff'd* 569 F.2d 1154 (5th Cir. 1978).

**V**

We have rejected Fabric World's three contentions in this appeal. Accordingly, the judgment of the district court is

AFFIRMED.

---

**7.** The parties have litigated this case, both in the court below and on appeal, as though Alabama substantive law controlled. We see no reason why the law of Alabama should not apply.

**8.** Section 2–202 states:

> *Final written expression: Parol or extrinsic evidence.*
>
>   Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or

of a contemporaneous oral agreement but may be explained or supplemented:

>   (a) By course of dealing or usage of trade (section 7–1–205) or by course of performance (section 7–2–208); and
>   (b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

**9.** Fabric World's reliance on *Jewell v. Jackson & Whitsitt Cotton Co.,* 294 Ala. 112, 313 So.2d 157, 160–61 (1975), is misplaced for the reasons set forth in *Loeb & Co. v. Martin,* 295 Ala. 262, 327 So.2d 711, 715 (1976).