**LINTON & COMPANY, INC., Plaintiff,**

v.

**ROBERT REID ENGINEERS, INC., a corporation, and R. L. Reid, comprising a joint venture known as R. L. Reid Joint Venture, Defendants.**

Civ. A. No. 79–411–N.

United States District Court,
M. D. Alabama, N. D.

Jan. 8, 1981.

**1170**

Rushton, Stakely, Johnston & Garrett, Robert A. Huffaker, Montgomery, Ala., for plaintiff.

London, Yancey, Clark & Allen, James E. Clark, Birmingham, Ala., for defendants.

## MEMORANDUM OPINION

HOBBS, District Judge.

This case arises out of the termination by the State of Alabama Highway Department of a contract with defendants. After the termination, the Highway Department made a final settlement with defendants. Plaintiff, as a subcontractor of defendants, claims that it is entitled to a portion of the proceeds of the settlement, and that defendants have refused to pay plaintiff. Plaintiff's claim is based on breach of contract and work and labor done for defendants.

This cause came on to be heard at trial before this Court on November 17, 1980. Final submission to the Court for decision was December 9, 1980, the date the Court received the last brief from the parties. Jurisdiction of this cause is based on diversity, 28 U.S.C. § 1332, this action being between citizens of different states and the matter in controversy exceeding $10,000, exclusive of interest and costs. After consideration of the testimony and exhibits presented at trial and the post-trial briefs submitted by the parties, the Court holds that plaintiff is entitled to a judgment against defendants Robert Reid Engineers, Inc. and R. L. Reid in the amount of $66,-348.49.

## FACTS

Plaintiff is a consulting firm engaged primarily in urban planning and environmental studies, maintaining its principal office in Washington, D. C. Defendant R. L. Reid is an officer and shareholder of Robert Reid Engineers, Inc. and Robert Reid Consulting Engineers, Inc. Both of these corporations perform engineering services and

maintain their principal offices in Houston, Texas. Although these corporations are separate entities, their names were used interchangeably during the course of this dispute.

The present dispute between the parties relates to work done incident to the planned construction of the Red Mountain Expressway in Birmingham, Alabama. This Expressway is presently incomplete in part because a portion of the Expressway was originally designed to go through or near a low cost housing project in the central city section of Birmingham, thus presumptively disturbing the lives of many people. When completed, the Expressway will serve as an interchange to the interstate highway system in the Birmingham area. In an effort to arrive at the most suitable route for the completion of this Expressway, the State of Alabama Highway Department entered into a contract with Robert Reid Engineers, Inc. on December 27, 1976 under which Robert Reid Engineers, Inc. agreed to prepare required environmental impact statements and to perform preliminary engineering on the selected route.

Robert Reid Engineers, Inc. entered into a subcontract on December 27, 1976, with plaintiff wherein plaintiff agreed to contribute to the preparation of the environmental impact statements. Plaintiff's work specifically was to relate to land use, socioeconomic and relocation studies. This subcontract was signed by Robert A. Chester as Vice President of Robert Reid Consulting Engineers, Inc., in Houston, Texas. R. L. Reid never signed the subcontract. The subcontract was sent to Washington, D. C. where Linton executed it.

Plaintiff in turn entered into a sub-subcontract with Messer Associates, Inc. who agreed to assist plaintiff primarily by performing traffic, air and noise studies. This contract was also dated December 27, 1976 and was executed by Messer at its principal office in Maryland.

In the early part of 1977, after all of the contracts had been signed, the State of Alabama Highway Department became concerned about the financial ability of Robert Reid Engineers, Inc. to perform in accordance with the contract. Consequently, the Highway Department contacted Mr. Reid and told him that Robert Reid Engineers, Inc. would be required to put up a bond. After informing the Highway Department that the corporation was unable to put up such a bond, Mr. Reid discussed with the Department various methods to eliminate the Department's concern. They finally agreed that Mr. Reid would enter into a joint venture with Robert Reid Engineers, Inc. and that the contract would be changed to name the joint venture as a party to the contract. Accordingly, such a joint venture was formed known as R. L. Reid Joint Venture, and the State of Alabama entered into a contract with said Joint Venture.

The front page and first page of the subcontract between Linton and Robert Reid Engineers, Inc. were altered to reflect the fact that it was a contract between the Joint Venture and plaintiff. The sub-subcontract between Linton and Messer also was altered to reflect that Linton had entered into the subcontract with the Joint Venture.

The prime contract required the Joint Venture to maintain an adequately staffed office in the Birmingham area for the duration of the contract. The prime contract further provided that the Joint Venture in the formative stages would perform all work in the Birmingham office. In an attempt to comply with these requirements, the Joint Venture leased an office in Birmingham and staffed it with two employees who resided in Birmingham.

Linton, on the other hand, was not required to maintain an office in Alabama. During the limited time Linton's employees were in Alabama, they used the Joint Venture's office for which Linton paid a service charge of approximately one hundred dollars per month. Linton did not, however, maintain a mailing address, telephone, bank account or property in Alabama.

During the time of negotiating the subcontract as well as performing upon it, Linton had three or four employees who came to Alabama to collect data for the environ-

mental impact statements for the proposed Red Mountain Expressway project. During the entire two and a half year period that Linton was involved in this project, which includes the time spent negotiating the contract, Linton's employees made approximately twelve trips to Alabama. The average duration of a trip was two or three days with the employees staying in hotels while in Alabama and returning to Linton's Washington offices. At least seventy-five per cent of Linton's work pursuant to the subcontract was performed in its offices in Washington, D. C. Much of the work done by the Joint Venture was performed in Texas.

Work on the contracts continued for several months. On May 22, 1978, however, the State's division engineer in charge of the project wrote the interstate engineer for the Highway Department criticizing the work of Robert Reid Consulting Engineers, Inc. and refusing to approve an invoice submitted by it. The basis of the criticism was that Robert Reid Consulting Engineers, Inc. violated the contract by failing to maintain an adequately staffed office in Birmingham and that it had not completed a certain phase of the project on time. The State admitted that from three to six months of the delay was attributable to the State but asserted that Robert Reid Consulting Engineers, Inc. had no excuse for failing to perform other parts of the contract in a timely fashion.

A meeting was scheduled for May 31, 1978, to allow Reid to defend these charges. John Spencer, an officer of Robert Reid Consulting Engineers, Inc. wrote Linton's project manager, attaching a copy of the State's letter criticizing Robert Reid Consulting Engineers and asked him to make any comments he felt would aid it in defending itself at the meeting. The officers of Linton reviewed the letter and determined that the criticisms were not directed at Linton. They, therefore, concluded that there was nothing for Linton to defend. The President of Linton called Spencer and informed him of its position. Spencer replied that there was no real need for Linton to attend the meeting.

Following the meeting, the Alabama Highway Director wrote R. L. Reid terminating the prime contract. On June 26, 1978, Reid wrote Linton terminating the subcontract. In this letter Reid advised Linton that final payment to Linton would be made when Reid received payment from the State. (Pltf's Ex. 6). Linton promptly sent its work product and invoices to Reid's offices to enable Reid to receive payment from the State for such work. The quality of Linton's work was never criticized by the State. Nor did Reid criticize the progress or quality of Linton's work for months after this law suit commenced. Both Mr. Reid and the project engineer of the Reid Joint Venture had testified on deposition that they did not contend that any of the delay was attributable to Linton. (Reid depo., pp. 31–33; Spencer depo., pp. 13–14). At trial, however, Reid suggested that Linton was partially responsible for the delay. The performance of Linton's work was not a factor in the State's decision to terminate its contract with Reid.

The contract with the State and the Joint Venture's contract with Linton were essentially cost plus contracts. After the termination of the contract, the State conducted audits and inspections to determine the amount of money the State owed Reid. This amount included those sums Reid owed its subcontractors. Reid submitted invoices to the State totalling $218,515.91, which included $76,175.99 of unpaid invoices of Linton and Linton subcontractors. The State disallowed $9,827.50 of these Linton invoices which were deemed overcharges. Thus, the allowed unpaid invoices of Linton and its subcontractors were $66,348.49.

Reid entered into negotiations with the State concerning the disallowed Joint Venture invoices, and finally agreed on a settlement of $167,500 of which Reid paid Gerald Wallace $17,500 for his efforts as an attorney in arranging the settlement. Mr. Reid executed a settlement agreement and release with the State on behalf of himself and Robert Reid Consulting Engineers, Inc. Reid individually and Robert Reid Consult-

ing Engineers, Inc. expressly warranted in its settlement with the State that all subcontractors had been paid in full or would be paid in full upon payment by the State to Reid. Although Reid was paid by the State on March 6, 1979, Reid has refused to pay anything to Linton. Consequently, Linton initiated this suit to recover money for breach of contract and work and labor done.

## CONCLUSIONS OF LAW

### I. *DOING BUSINESS*

Plaintiff has never qualified to do business in Alabama. Defendants claim that this failure precludes plaintiff from bringing this action.

Section 10–2–254 of the Code of Alabama provides in pertinent part as follows:

> All contracts or agreements made or entered into in this state by foreign corporations which have not qualified to do business in this state shall be held void at the action of such foreign corporation, but nothing in this section shall abrogate the equitable rule that he who seeks equity, must do equity . . .

Section 10–2–256 of the Alabama Code further provides the following:

> The provisions of this division do not apply to corporations . . . engaging in or transacting business of interstate commerce only within this state.

Pursuant to §§ 254 and 256, a foreign corporation that does business in Alabama without being duly qualified to do so is precluded from bringing a lawsuit to enforce any contracts entered into by it in Alabama unless such corporation is engaged in or transacted business of interstate commerce or unless the enforcement of the provision would offend the proviso relative to doing equity. *Foxco Industries, Ltd. v. Fabric World, Inc.*, 595 F.2d 976 (5th Cir. 1979). Such a foreign corporation is barred from suit in Alabama state courts "and is similarly barred from bringing its claim in a diversity action in federal district court." *Id.* at 980; *Fred Hale Machinery, Inc. v. Laurel Hill Lumber Co.*, 483 F.2d 58 (5th Cir. 1973).

The Alabama doing business statutes are penal in nature. *First Bank of Russell County v. Wells*, 358 So.2d 435 (Ala. 1978). The Alabama penalty is particularly harsh because unlike most state statutes, the Alabama statutes do not permit a corporation that is doing business in Alabama without qualifying to do so to subsequently qualify in order to enforce contracts entered into prior to qualification. Because these statutes are penal in nature and are in derogation of the common law, the Court must apply a strict construction, *id.*, and when construing the statutes the Court must make the following two-step inquiry:

(1) Is the foreign corporation doing business in Alabama; and

(2) If so, will the application of the Alabama law barring suit impede interstate commerce in violation of the commerce clause of the Constitution.

*Foxco*, 595 F.2d at 980; *SAR Mfg. Co., Inc. v. Dumas Bros. Mfg. Co.*, 526 F.2d 1283, 1284 (5th Cir. 1976).

### A. *Was Linton doing business in Alabama?*

"Contracts made outside of Alabama are valid when made. The making of such contracts outside the state does not constitute doing business in the state. If the contract is to be performed in the State of Alabama, it is its *performance* which would amount to doing business in Alabama." *Lee v. Great Northern Nekoosa Corp.*, 465 F.2d 1132, 1135 (5th Cir. 1972) (emphasis in original). In the present case, Robert Reid Engineers, Inc. signed the contract in Texas and Linton signed it in Washington, D. C. Thus, when the present contract was entered into by the parties, it was valid.

If Linton performed on the contract, then that performance would constitute doing business, and thus Linton would have been required to qualify. The Court has serious doubts as to whether Linton performed on the contract in Alabama within the meaning of *Lee*. Performance of services in Alabama "incidental to" interstate contracts is not doing business in Alabama.

*Matter of Delta Molded Products, Inc.*, 416 F.Supp. 938 (N.D.Ala.1976); *Houston Canning Company v. Virginia Can Company*, 211 Ala. 232, 100 So. 104 (1924).

Here, Linton's employees came to Alabama on approximately twelve occasions to gather data and return to Linton's Washington offices to analyze the data, thereby enabling it to make its environmental impact statements. The Court declines to decide whether under these facts Linton performed on the contract sufficiently to constitute doing business or whether this performance was merely incidental to an interstate contract because even if Linton was doing business, the Court holds that this application of the doing business statutes impedes interstate commerce in violation of the United States Constitution and Alabama Code § 10–2–256.

### B. *Interstate commerce*

■ Assuming Linton was doing business in Alabama without being duly qualified to do so, the Court must determine whether the work done by Linton falls within the exception required by the United States Constitution and expressly provided for in § 10–2–256 of the Alabama Code for corporations engaging in interstate commerce within the state. The Court notes that the present suit involves services rather than goods. But "all interstate commerce is not sales of goods." *Furst v. Brewster*, 282 U.S. 493, 497, 51 S.Ct. 295, 296, 75 L.Ed. 478 (1931). In *Furst*, the Court defined interstate commerce as follows:

> Importation into one state from another is the indispensable element, the test, of interstate commerce; and every negotiation, contract, trade, and dealing between citizens of different states, which contemplates and causes such importation, whether it be of goods, persons, or information, is a transaction of interstate commerce. Such commerce comprehends all the component parts of commercial intercourse between different states, and, according to established principle, any state statute which obstructs or lays a direct burden on the exercise of the privilege of

engaging in interstate commerce is void under the commerce clause. *Id.*

More recently, in *Diversacon Industries v. National Bank of Commerce*, 629 F.2d 1030 (5th Cir. 1980), the Court of Appeals stated that "where the scope of [the foreign corporation's] activities extended beyond the Mississippi border for the consummation of a definite interstate project, we hold it would be an impermissible burden on interstate commerce to give effect to denial of access through this qualification statute."

Similarly, this Court is of the opinion that Linton's "activities" beyond the Alabama border were performed for "the consummation of a definite interstate project." The fact that Linton's research—most of it performed in Washington, D. C. and transmitted to defendants in Houston, Texas—would ultimately assist a Texas joint venture in performing environmental studies for a proposed construction of an interstate highway in Alabama does not alter the interstate nature of the work of Linton. The finished product which would not be the work of Linton or even the work of the Joint Venture is not decisive in determining whether Linton's work is interstate commerce. Rather it is the "activity" of Linton which must be considered in determining whether its work is a part of interstate commerce. Where Linton traveled to Alabama on numerous occasions to gather data and then returned to Washington to analyze such data and transmitted its recommendations to defendants in Houston, Texas, the Court concludes that the transaction was of "an interstate character." Consequently, the application of § 10–2–254 "would unreasonably burden interstate commerce" in the present case and therefore Linton is not precluded from bringing this lawsuit.

### C. *Equity*

■ The Court notes that even if Linton's activities were not a part of interstate commerce, defendants would still be precluded from asserting this defense on equitable grounds. Section 10–2–254 of the Code of Alabama expressly provides that

the qualification requirement is not to "abrogate the equitable rule that he who seeks equity must do equity."

In the present case, defendants' work within Alabama was much more extensive than that of plaintiff. Defendants were required by the prime contract to maintain an office in Alabama which they did. In addition, the office was staffed with two fulltime employees. Nevertheless, defendants did not deem it necessary to qualify to do business in Alabama. It would be most unjust and inequitable to permit the general contractor to bar the doors of the courthouse to its subcontractor for failing to qualify to do business when the general contractor with far more activity in Alabama and over a longer period of time, never did so qualify. The Court is of the opinion that this failure to qualify by Robert Reid Engineers, Inc. precludes defendants from asserting this defense. This is not a determination that Robert Reid Engineers, Inc. was required to qualify to do business in Alabama.

## II. *PERSONAL LIABILITY OF R. L. REID*

■ R. L. Reid contends that he is not personally liable on the subcontract because he never signed the subcontract. The only signature on the subcontract for the general contractor is that of Robert L. Chester, as Vice President of Robert Reid Consulting Engineers, Inc. The first page of the agreement which was prepared by defendants notes that it is entered into between Linton and a joint venture consisting of Robert Reid Engineers, Inc. and R. L. Reid individually. If there is an ambiguity in the agreement with respect to R. L. Reid's personal liability by reason of his failure to personally sign it, the Court must determine the intent of the parties. "It is the duty of the court in the construction of written contracts to place itself in the situation of the parties, and from a consideration of the surrounding circumstances, the occasion, and apparent object of the parties, to determine the meaning and intent of the language employed." *Connecticut General*

*Life Ins. Co. v. Craton*, 405 F.2d 41, 46 (5th Cir. 1968).

In construing the surrounding circumstances, the Court concludes that all parties intended that the Joint Venture be a party to the subcontract. This conclusion is most strongly supported by R. L. Reid's affidavit and answers to interrogatories filed in this cause and admitted in evidence at trial as Pltf's Exs. 39 and 36, respectively. In his sworn affidavit, Reid stated that he was "the person connected with the Joint Venture which negotiated and executed the contract with Linton and Company, Inc. which is made the basis of this suit." In his sworn answers to interrogatories, Reid specifically admitted that the Joint Venture entered into the contract with Linton and repeatedly referred to the contract as being between Linton and the Joint Venture. Further, Reid did not assert this defense of his not being bound by the contract until after the pretrial conference and shortly before trial, which indicates that this defense was merely a last minute effort to shield one of the two joint venturers from a contract which all parties viewed as including Reid individually.

Moreover, Reid personally warranted to the State that he had paid or would pay the subcontractors upon settlement with the State. (See Pltf's Ex. 24). Of the $167,000 received by Reid under this cost plus contract, this Court finds that $66,348.49 was for work performed by Linton or its subcontractors. Whether the Court was to view this warranty on a theory of a constructive trust, or as a third party beneficiary contract or on general principles of equity, the Court is of the opinion that it would be inequitable to allow Reid to retain the funds that he received on behalf of Linton. Therefore, the Court concludes that R. L. Reid is personally liable to plaintiff.

## III. *AMOUNT OWED TO LINTON*

■ The State of Alabama auditors determined that of the total invoices submitted by Reid there were overcharges of approximately $32,672.34. Of this amount, $9,827.50 was challenged and disallowed by

the State as representing overcharges of Linton. Thus, this amount must be deducted from Linton's total invoices to Reid. The corrected total is, therefore, $66,348.49. Reid also claims that certain other expenses should be offset against this figure. These expenses relate primarily to Reid's disallowed fees and expenses incurred in arriving at a settlement with the State. The Court finds that the contract termination was based on Reid's failure to satisfy the terms of the contract. There was never a question as to the quality of Linton's work. Therefore, any fees of Reid's that were disallowed and expenses that Reid incurred in settling its claim with the State should be borne by Reid and not by Linton.

Reid also claims that $13,313.40 of Linton's invoices should be disallowed because they relate to fees paid by Linton to consultants who failed to properly qualify with the Highway Department in accordance with the contract requirements. Neither the State nor Reid ever regarded the failure to get a written authorization from the State and/or Reid for any subcontractor as material until this litigation commenced. Invoices from the subcontractors were honored by the State and Reid as the work progressed. Reid was not even aware at the time of trial whether in fact the Linton subcontractors had been formally authorized. Apparently one of Linton subcontractors had been "properly" authorized and one had not. But all parties had waived such failure and the State recognized its obligation to pay the invoices of the Linton subcontractors. Therefore, the Court declines to offset this amount. Based on the above analysis, the Court is of the opinion that Linton is entitled to a judgment in its favor in the amount of $66,348.49.

A judgment will be entered in accordance with this opinion.